# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

DIANE E. KEYSER,

          Plaintiff,

vs.

CAROLYN W. COLVIN, Commissioner
of Social Security,

          Defendant.

No. C12-3050-MWB

**REPORT AND RECOMMENDATION**

---

## *Introduction*

Plaintiff Diane Keyser seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. § 405(g). Keyser contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she is not disabled. For the reasons that follow, I recommend that the Commissioner's decision be reversed and remanded for further proceedings.

## *Background*

Keyser was born in 1955 and completed high school. AR 37-38. She previously worked as a general clerk and a teacher aide. AR 313. Keyser protectively filed for DIB on September 21, 2009, alleging disability beginning on July 31, 1999, due to bipolar disorder, borderline personality and irritable bowel syndrome. AR 195-200. Her claims were denied initially and on reconsideration. AR 60-63, 65-68. Keyser requested a hearing before an Administrative Law Judge ("ALJ"). AR 69. On September 20, 2011, ALJ Thomas Donahue held a hearing via video conference during which Keyser and a vocational expert ("VE") testified. AR 34-53.

On November 9, 2011, the ALJ issued a decision finding Keyser not disabled since July 31, 1999. AR 16-28. Keyser sought review of this decision by the Appeals Council and submitted additional evidence. AR 4, 11. The Appeals Council denied her request for review on June 8, 2012. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. § 404.981.

On July 18, 2012, Keyser filed a complaint in this court seeking review of the ALJ's decision. This matter was referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues, and the matter is now fully submitted.

### Summary of Evidence

I have reviewed the entire administrative record and provide the following summary of the evidence relevant to Keyser's claim.

### A.      Medical Evidence

Keyser has been diagnosed with the following physical impairments: mild bilateral carpal tunnel syndrome, plantar fasciitis, obstructive sleep apnea, degenerative joint disease of the knees, left trochanteric bursitis, irritable bowel syndrome and moderate obesity. AR 324, 361, 366, 374, 386, 391, 594-95. Her mental impairments include depression and borderline personality disorder. AR 455-57.

Keyser saw Julie Schneider, ARNP, in November 2007 for depression and borderline personality disorder. AR 401-04. She explained that she had been hospitalized for suicide attempts three times in the past with the most recent in 2002. She had been treated for depression for the past 15 years. *Id.* Keyser said her mood was usually okay as long as she was compliant with her medications. She was working part-time at the school as a substitute paraeducator. *Id.* Schneider continued Keyser's current medications.

During her treatment with Schneider until February 2009, Keyser reported symptoms of insomnia, indicating she slept more often during the day and had decreased energy. AR 406. She continued working at the school but took a brief hiatus after she was turned down for a full-time position. AR 406. She also worked part-time at an animal shelter and took online classes to become a paralegal. AR 407-14, 525-54. Keyser's Global Assessment of Functioning ("GAF")[1] scores ranged from 50-55.

Keyser also received treatment from Berryhill Center for Mental Health ("Berryhill") off and on for the past 10 to 15 years. AR 449-51. In January 2009, she indicated that she had difficulty holding jobs in the past but felt most of the problem was due to her physical condition. AR 454-54. She believed her memory deteriorated over the past five years as a result of her Ambien medication, but also indicated it had not improved when she stopped taking it. *Id.* Her GAF scores remained the same.

Keyser often admitted she was not compliant with her medication. AR 445-48, 619, 631, 638. In some instances, she stopped taking her medications because she noticed side effects such as weight gain or numbness even though she acknowledged it was helpful for mood stabilization. AR 497, 498, 520, 640. On one occasion she complained it was too exhausting for her to take her medication and another time she began taking a higher dose because cutting the pills was too difficult and she felt the higher dose was better. AR 448, 631. She also indicated that she felt better when she was compliant with her medication. AR 437, 445-46, 498, 619.

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

In March 2009, Keyser was laid off at the animal shelter and was working more at the school. AR 443. During this time she reported feeling better and being more motivated and better able to concentrate. AR 442. She was put on a "call-in basis" for treatment in April 2009 because she had difficulty keeping scheduled appointments. AR 439. On September 21, 2009, Patricia Hull, LISW, noted that Keyser had applied for disability but was working part-time at the school and still looking for full-time work. AR 430. On October 5, 2009, James Burr, MS, reported that Keyser said she mostly stayed around the house and did not do much. AR 429. She was still working part-time at the school, but he did not believe she was highly motivated to find a full-time job. *Id.*

In January 2010, Keyser said she was no longer working but was looking for work. AR 496. In April, she indicated she found part-time work but was "feeling somewhat caught" because the employer wanted to know if she could work while applying for disability. AR 639. She asked Burr to write a letter to the employer indicating she was able to work. *Id.* In August, she indicated she had turned down the job and decided to pursue her disability claim. AR 629.

In September 2010, Burr indicated one of his biggest concerns with Keyser was her inability to be consistent in coming in for appointments and her inability to confront unpleasant things and take care of them. AR 626. He noted the next month that she struggled with anxiety and thought this could be affecting her memory at times. AR 624.

Joan Kitten, ARNP, completed a mental residual functional capacity ("RFC") assessment on February 22, 2012, at the request of Keyser's attorney. AR 718-22. She identified several signs and symptoms associated with Keyser's mental impairments. She also found Keyser was unable to meet competitive standards in tasks associated with semi-skilled work such as understanding and remembering detailed instructions, setting realistic goals or making plans independently of others and dealing with the stress of semiskilled and skilled work. *Id.* Kitten noted Keyser was seriously

4

limited, but not precluded in her ability to carry out detailed instructions, interact appropriately with the general public, travel in an unfamiliar place and use public transportation. *Id.* She anticipated that Keyser's impairments or treatment would cause her to be absent from work more than four days per month. *Id.*

As for Keyser's physical impairments, she had lap band surgery in June 2011. AR 601-02. She felt that obesity contributed somewhat to her depression and depression contributed to her lack of exercise to an extent. AR 363-64. She also frequently complained of musculoskeletal pain in her knees and low back, which appeared to be worsened by her being overweight. *Id.*

Keyser also sought treatment for her irritable bowel syndrome ("IBS"), knee pain and hip pain. AR 556, 601-02. She was instructed to take MiraLax for IBS. AR 601-02. She had knee surgery in 2001 to repair a right knee medial meniscus tear. AR 556. She continued to experience periodic pain and was told to take over-the-counter anti-inflammatory medication. *Id.* Her hip pain was treated with steroid injections as needed. *Id.*

### B.    *State Agency Consultants*

Jennifer Ryan, Ph.D., performed a mental RFC assessment and psychiatric review technique on November 25, 2009. AR 473-90. In her mental RFC assessment, she found that Keyser was moderately limited in her ability to carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. AR 474-74. In all other areas she was not significantly limited.

In the narrative portion of her assessment, Dr. Ryan found the evidence was insufficient to evaluate the time period between Keyser's alleged onset date of July 31, 1999, and September 1, 2005. AR 475. She noted that the medical evidence indicated

Keyser's condition was stable and she had been doing reasonably well until April 17, 2006, when Keyser reported marital issues and situational stressors. *Id.* Her symptoms indicated moderate severity. She also noted there was a gap in the medical evidence from September 1, 2006, until January 1, 2009, although Keyser continued her psychotropic medications during this time. *Id.* She noted that Keyser's impairments did not meet or equal a listing, but were severe. Based on the evidence in the record, Dr. Ryan found there were some limitations with Keyser's ability to carry out detailed instructions. AR 476. She also found the evidence supported limitations in the area of social functioning, but Keyser was able to engage in brief appropriate interaction with others. She found Keyser's statements to be generally credible. *Id.* Dr. Ryan concluded that Keyser could be expected to follow simple to moderately complex instructions and perform work tasks consistent with this ability. In addition, she thought she would function best in environments with limited interpersonal demands. *Id.*

In her psychiatric review technique, Dr. Ryan found Keyser had mild limitation in her activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace. She had no episodes of decompensation. AR 487.

Dr. Ryan performed a case analysis on February 16, 2010, when new evidence from Berryhill was added to the record. AR 505. Dr. Ryan found these medical records indicated relative stability of Keyser's mood and no suicidal ideation. Keyser had also expressed difficulty with online classes during this time. She found that these records were consistent with the rest of the medical evidence and did not alter her initial assessment. *Id.*

Dee Wright, Ph.D., reviewed the file on reconsideration on May 7, 2010. AR 529. On reconsideration, Keyser alleged her depression had not improved with medication, she was having difficulties with her concentration and memory and she alleged additional problems with her IBS. She found that the updated treatment

information did not indicate evidence of functional deterioration.  *Id.*  Keyser continued to have moderate cognitive and social limitations consistent with Dr. Ryan's review. She reaffirmed Dr. Ryan's assessment as written.  *Id.*

Donald Shumate, D.O., performed a case analysis for Keyser's alleged physical impairments on February 16, 2010.  AR 506.  He noted the record was insufficient prior to February 2006 for any physical impairment.  *Id.*  Dr. Shumate reviewed her function report and the third party function report and noted that Keyser did little at home.  She claimed she could not lift much weight, but did not provide a specific reason.  She claimed to have trouble walking due to bad feet and bad hips, but she had not sought ongoing treatment.  *Id.*  She also claimed to have stool incontinence, but she did not indicate her stool frequency.

Dr. Shumate found that Keyser had medically diagnosed impairments of IBS, mild bilateral carpal tunnel syndrome, left trochanteric bursitis, possible osteoarthritis of the knees and obstructive sleep apnea.  *Id.*  He noted that she was placed on Pamelor and Metamucil for stool incontinence in August 2009 and at her last visit this was improved.  *Id.*  He found her IBS to be non-severe.  After Keyser had an EMG in April 2008 that revealed mild bilateral carpal tunnel syndrome, Dr. Shumate commented the record contained no additional complaints or treatment.  *Id.*  He also noted that her plantar fasciitis was deemed resolved in October 2008.  He did not believe a recent avulsion fracture of her right tibia in October 2009 would be expected to result in any residual impairment.  He concluded that the medial evidence did not support any severe physical impairments that would preclude work-related activity.  *Id.*

## C.    *Functional Capacity Evaluation*

Mark Blankespoor, PT/DPT, performed a functional capacity evaluation at the request of Keyser's attorney on January 26, 2012.  AR 710.  In his summary, he noted Keyser "does not display the capacity to perform any tasks or activities on a frequent or continuous basis."  AR 711.  He found that her current capabilities placed her in the

sedentary category meaning she was able to lift up to 15 pounds on a rare basis and up to five pounds on an occasional basis. AR 711. He also found that she would have significant difficulty performing work tasks on a full-time basis as she would not be able to engage in lifting, carrying, pushing, pulling, gripping, pinching, sitting, standing, walking, dexterity or positional tasks on a continuous daily basis. *Id.*

## D.      *Function Reports*

Keyser completed function reports on April 11, 2009, and October 27, 2009. AR 165-72, 222-30. Her husband, Randy Keyser, also completed function reports on October 25, 2009 and April 12, 2010. AR 212-19, 281-88. In her reports, Keyser said she spent most of her day in bed watching television. AR 169, 222. She would eat cold cereal and bathe once a week or when she had a doctor appointment. AR 167, 223-24. Her impairments affected her ability to lift, squat, bend, stand, walk, kneel and climb stairs. She also had difficulties with seeing, memory, completing tasks, concentration, following instructions, using her hands and getting along with others. AR 227. She thought she could walk 50 feet before needing to stop and rest for five to ten minutes. *Id.* She also explained that if she were to work she would not be able to eat due to fears of stomach cramps and fecal incontinence. AR 230. She stated her uncontrollable bowels would require her to change clothes and use the restroom several times a day, which would take her away from the job for long periods of time. *Id.*

The third party function reports provided by her husband reflect many of the same alleged limitations. He noted that she slept and watched television during the day. AR 281. He would cook and she would only make cold cereal or toast. AR 283. He also explained that she could not be around people if she was not on her medication. AR 286. He thought she could pay attention for minutes at a time and could not walk far due to her bad hips. *Id.* He noted that she had been fired from several jobs and had difficulty getting along with her bosses and co-workers. AR 287.

*Hearing Testimony*

Keyser testified at the hearing that she lived with her husband and her 22-year-old son. AR 38. She graduated from high school and the last time she worked for wages was in January 2005. AR 39-40. Keyser explained she continued to suffer from IBS and would either have constipation or diarrhea at any given time. She also had uncontrollable bowel movements, which required her to wear Depends on a daily basis. AR 40. She would have diarrhea three to four days per week and on those days she would go to the bathroom three or four times a day. AR 41. She estimated that she would not make it to the bathroom three or four times a week and she often needed to shower at least twice a day. AR 42.

As for her knees, Keyser indicated she had been diagnosed with arthritis in both knees. AR 42. She constantly experienced pain and it worsened with walking, stooping or bending. AR 42-43. She thought she could walk a block before needing to sit and rest. AR 43. She would need 15 minutes of rest before walking again. *Id.* She thought she could stand in place for about 10 minutes. *Id.*

Keyser stated she was receiving mental health treatment at Berryhill for borderline personality disorder, bipolar disorder, mood disorders, major depression and anxiety. AR 43-44. She indicated she had problems with concentration and would often get confused. AR 44. She tended not to go grocery shopping or anywhere with large crowds because those situations gave her anxiety. *Id.* Keyser also testified she was easily distracted. *Id.* Due to her depression she would often stay in bed all day watching television. AR 45. She said she had no interest in anything and would feel worn out and lethargic. *Id.*

Keyser also testified about the medications she was taking. She took Depakote for her mood disorder, Ambien to help her sleep, Abilify and Pristiq for depression, and a couple medications for her IBS and GERD. AR 45-46. She had also recently been prescribed medication for arthritis in her knees. As for side effects, she testified

that Depakote caused shaking and jerking in her hands and Ambien caused her to have memory loss and confusion. AR 47.

The ALJ provided the following hypothetical to the VE at the hearing:

> First hypothetical would be age 56, a female. She has 12th grade education, past relevant work as set forth in Exhibit B19E. Lifting 20 pounds occasionally, 10 pounds frequently. Sitting and standing two hours at a time for six of an eight-hour day. Walking, two blocks. No climbing ladders, ropes, and scaffolds. No working at heights. Claimant would need a lower stress level, such as a level 4, with 10 being the most stressful and 1 being the least stressful.

AR 48. The VE indicated that Keyser's past work could be performed under this hypothetical. *Id.* He also found that she had transferable skills to work as a unit clerk in medical services, identification clerk and a distributing clerk. AR 48-49. These jobs were either light or sedentary and semi-skilled. The VE also identified unskilled jobs that would be available such as a mail clerk in private industry or order clerk in the food and beverage industry.

The ALJ's second hypothetical included the same age, education, and vocational background, but with the following limitations:

> Lifting 20 pounds occasionally, 10 pounds frequently. Sitting and standing two hours at a time for six of an eight-hour day. Walking, two blocks. No climbing ladders, ropes, and scaffolds. No working at heights. Due to depression, mental impairment, or any other reason, the claimant would miss three or more days of work per month.

AR 49-50. The VE did not think she could perform past relevant work under this hypothetical and there were no transferable skills or unskilled jobs available for someone with those limitations. AR 50.

Keyser's attorney asked the VE to consider the first hypothetical with the additional restriction that the individual would need one to three unscheduled bathroom breaks each day that would last 10 to 15 minutes each. *Id.* The VE thought one to two

unscheduled breaks would not be a problem, but three would likely be unacceptable on a daily basis. AR 51. Keyser's attorney also asked if an employer would tolerate a worker who needed to take an unscheduled break for thirty minutes to an hour twice per week. This was based on Keyser's testimony about her uncontrollable bowel movements, which required her to take a shower. The VE did not think an employer would tolerate such breaks. AR 51-52.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1)     The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

(2)     The claimant has not engaged in substantial gainful activity since July 31, 1999, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3)     The claimant has the following severe impairments: degenerative joint disease of the knees; obesity, status post gastric bypass surgery; carpal tunnel syndrome; major depressive disorder vs. bipolar disorder; and personality disorder (20 CFR 404.1520(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting and standing two hours at a time for a total of six hours of an eight-hour day, and walking no more than two blocks at a time. Additionally, she cannot climb ladders, ropes, or scaffolds, and cannot work at heights. Moreover, the claimant needs a lower stress

level such as a level "4" where level "10" is the most
stressful and "1" is the least stressful.

(6)     The claimant is capable of performing past relevant
        work as a clerk, general, Dictionary of Occupational
        Titles (DOT) number 209.562-010. This work does
        not require the performance of work-related activities
        precluded by the claimant's residual functional
        capacity (20 CFR 404.1565).

(7)     The claimant has not been under a disability, as
        defined in the Social Security Act, from July 31,
        1999, through the date of this decision (20 CFR
        404.1520(f)).

AR 16-28.

        The ALJ found most of Keyser's impairments to be severe, except for IBS,
plantar fasciitis, obstructive sleep apnea and trochanteric bursitis. AR 18. He also
found that her lower back degenerative disc disease was a non-medically determinable
impairment because the diagnosing physician did not reference any objective
radiological data to confirm it. AR 19. The ALJ did not find that any of Keyser's
impairments met or equaled a listing. AR 19. He considered the listing criteria of
12.04, 12.06 and 12.08 for her mental impairments.

        The ALJ considered the effects of all of Keyser's impairments including her non-
severe impairments. Specifically, he took into account her allegations that she needed
15-minute bathroom breaks three or four times per day, her confusion and lapses in
concentration in crowds, pain when walking distances greater than one block and her
difficulty standing in one place longer than 10 minutes. AR 21.

        The ALJ discredited the limitations associated with IBS because the evidence
demonstrated she was noncompliant with her prescribed stool softener and her
symptoms only dated back to April 2011, which was less than 12 months from the date
of the ALJ's decision. She had also complained about these symptoms on only two
occasions.

The ALJ discredited the limitations associated with plantar fasciitis because she was diagnosed in June 2008 and a treatment note from October that same year indicated the use of orthotics had resolved all heel and arch pain shortly thereafter. The ALJ considered it a non-severe impairment since her symptoms were resolved within 12 months.

The ALJ found that the limitations associated with trochanteric bursitis had no more than a minimal impact on Keyser's ability to do basic work activity. AR 22. Her only treatment consisted of periodic steroid injections. The record showed these injections helped with her discomfort and physical examinations revealed she had full range of motion with flexion, extension, internal and external rotation in her hips. *Id.*

As for obstructive sleep apnea, the ALJ noted the record did not contain results of a sleep study.[2] AR 22. The ALJ also noted that there were several references in the record to Keyser's noncompliance with her prescribed continuous positive airway pressure ("CPAP") treatment. The ALJ pointed out there were few apnea-related symptoms in the record since 2009, suggesting Keyser's problems had been resolved. Therefore, he considered this impairment non-severe. AR 22.

With regard to carpal tunnel syndrome, the ALJ noted Keyser received little treatment and test results revealed mostly normal findings except for a reduction in the conduction velocity over her wrist on both hands. AR 23. The physician characterized it as mild and Keyser did not seek further treatment or complain of other symptoms, leading the ALJ to consider it a non-severe impairment as well. *Id.*

The ALJ went on to analyze the impairments and related limitations that had more than a minimal impact on Keyser's ability to do basic work activity. First, he considered knee osteoarthritis. The ALJ noted objective evidence did not confirm this diagnosis until May 2011. *Id.* He then noted she had undergone surgery in June 2011 and suffered periodic pain treated with over-the-counter anti-inflammatory medication.

---

[2] Sleep study results were added to the record before the Appeals Council as Exhibit B30F. AR 683-708.

The record indicated she still had full range of motion in her knee and walked with an unaffected gait. The ALJ thought the RFC fully accounted for any remaining functional limitations of this impairment. *Id.*

The ALJ also considered the effects of obesity as required by Social Security Ruling 02-1p. AR 23-24. He found that it caused more than minimal limitation, especially considering Keyser's physicians' opinions that her knee pain was further exacerbated by her weight. He concluded that his RFC determination fully accounted for these limitations in light of other evidence in the record such as Keyser's admissions regarding her unwillingness to exercise and her activities of daily living. AR 24. Keyser told one of her providers that she did not exercise because she was lazy. *Id.* The ALJ found this admission especially damaging because in June 2006, Keyser reported she had been exercising and found it helpful for her sleep, appetite and energy level, which were all healthy at that time. *Id.*

The ALJ found some inconsistencies between Keyser's function reports and her activities of daily living as evidenced in other parts of the record. For instance, she claimed she had little motivation or energy to leave the home or do chores, but she attended doctor's appointments up to three times per month and worked part-time as a teacher aide and at an animal shelter throughout the alleged period of disability. She also took college classes in 2009. *Id.* There is also evidence that Keyser wanted to work more, and quit her work at the school when she did not get an interview for a full-time position, which was unrelated to any impairment. The ALJ found that this evidence, coupled with her admissions regarding exercise, suggested she was only mildly limited in her activities of daily living and that the RFC accurately reflected this.

The ALJ also discredited Keyser's allegations of the severity of her social functioning and concentration, persistence, or pace due to her mental impairments. He noted that her records demonstrated noncompliance, attenuation of symptoms with prescribed treatment and only moderate restrictions in social functioning and concentration, persistence, or pace. Overall, the records suggested few problems and

14

often referenced "no complaints" besides medication refills. AR 25. There were instances in the record of increased symptoms when Keyser would stop taking her medication, but then reports of feeling well after resuming them. *Id.* The ALJ noted that when Keyser was taking her medication, she reported her mood was stable and she was working more hours. *Id.* However, even while recognizing that certain medication helped with her concentration, motivation and sleep, she discontinued it because it increased her appetite. *Id.* She stopped taking other medication because it made her tongue numb, and she reported feeling down after discontinuing it. She did not restart Abilify as suggested by her provider and when she finally did, she reported that it helped. *Id.* Generally, her providers noted that she had a pleasant attitude, cooperative behavior and maintained good eye contact. AR 26. She was able to spell two, five-letter words backwards correctly, repeat three out of three objects immediately after a five-minute delay, name the four most recent presidents and interpret proverbs in an abstract manner. *Id.* The ALJ found that all of these things suggested she had no more than moderate limitations in social functioning and concentration, persistence, or pace.

The ALJ gave great weight to the opinions of the state agency psychological consultants. *Id.* He found their opinions were consistent with Keyser's treatment history as a whole. He also considered the function report provided by Keyser's husband and discredited it for the same reasons he discredited Keyser's own allegations. He also noted that Mr. Keyser's credibility was undermined by his financial and emotional stake in the outcome.

The ALJ discredited the claimant's overall credibility due to her habitual noncompliance with treatment recommendations, her part-time work, the fact that her earliest treatment files were dated six years after her alleged onset date, her admissions of why she no longer worked, the lack of objective evidence, and the success of her treatment when she followed it. *Id.*

The ALJ found that Keyser could perform her past relevant work as a general clerk. He compared her RFC with the physical and mental demands of her job as a secretary at a bank and, based on the VE's testimony, concluded Keyser was able to perform that work as it was generally performed. He also found that she was able to perform other work available in significant numbers in the national economy such as a unit clerk, identification clerk and distributing clerk. AR 27-28. For these reasons, he found that Keyser had not been disabled since July 31, 1999. AR 28.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is

not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her

physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186,

188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

Keyser argues the Commissioner's decision should be reversed because: (1) new evidence in the record outweighs the opinions of the state agency consultants, (2) new evidence in the record demonstrates Keyser suffered episodes of decompensation, (3) the ALJ improperly discredited the third-party function report provided by Keyser's husband, (4) the ALJ improperly discredited Keyser's own subjective allegations and (5) the VE's testimony in response to the ALJ's hypothetical question is not supported by substantial evidence. I will address each argument separately below.

## A.    *Evaluation of Medical Opinions*

Keyser argues that the state agency psychological consultants' opinions do not deserve great weight because the record at the time of their review did not contain important medical evidence such as treatment notes from prior hospitalizations. Also, because the most recent state agency consultant's opinion is dated May 7, 2010, Keyser's most recent treatment records from Berryhill and the mental RFC assessment

completed by Joan Kitten, ARNP, were not considered.[3]  Keyser argues that Kitten's opinion as expressed in the RFC assessment deserves more weight, is consistent with the rest of the evidence, and undermines the ALJ's decision.

The Commissioner first points out that the evidence cited by Keyser was not in front of the ALJ, so he did not have an opportunity to discuss it.  She also argues that Keyser failed to show that substantial evidence did not support the ALJ's decision, even with the additional evidence now in the record.  Finally, the Commissioner argues Kitten's opinion does not undermine the ALJ's decision because Kitten is not an acceptable medical source under the regulations, her opinion is inconsistent with her treatment notes and it is conclusory and lacks explanation.

Keyser submitted additional evidence to the Appeals Council after the ALJ issued his decision.  Under the regulations, the Appeals Council must consider evidence that is new, material, and relates to the period on or before the date of the ALJ's decision.  20 C.F.R. § 404.970(b).  Evidence is new if it is "more than merely cumulative of other evidence in the record."  *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000).  It is material if it is "relevant to claimant's condition for the time period for which benefits were denied."  *Id.*  The Appeals Council here considered the additional evidence, but denied review.  AR 5.  I must now consider "whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

The new evidence includes: inpatient treatment records from Mary Greeley Medical Center dated January 6, 1997, to January 9, 1997; treatment records from Trinity Regional Hospital dated January 22, 1997, to January 27, 1997; psychiatry records from Mercy Medical Center dated January 12, 2001, to January 16, 2001, and February 27, 2001; records from Iowa Sleep Disorder Center dated November 7, 2008,

---

[3] Keyser acknowledges that Exhibits B27F through B32F (which include the above-named records) were presented to the Appeals Council and were not in the record when the ALJ made his decision.

to April 9, 2009; a WorkWell functional capacity assessment dated January 26, 2012, and a mental functional capacity assessment from Berryhill dated February 22, 2012.

Keyser suggests the evidence from Mary Greeley Medical Center (covering hospitalization for a suicide attempt) and Mercy Medical Center (covering hospitalization after assaulting her son's teacher) outweighs the opinions of the state agency psychological consultants because it comes from treating sources. I find that this new evidence has no effect on the ALJ's decision. First, the evidence from Mary Greeley Medical Center pre-dates Keyser's alleged onset date of disability. Second, neither exhibit establishes an "episode of decompensation" as discussed below. Third, while the evidence provides a more complete picture of her mental impairments closer to her alleged onset date, nothing in those records provides any functional limitations to suggest she is disabled. The hospitalization records reflect significant events in Keyser's mental history, but they do not establish disability or outweigh the opinions of the state agency psychological consultants who have reviewed her relevant medical history since her alleged onset date and determined functional limitations related to her impairments.

Keyser also believes the mental RFC assessment from Kitten deserves more weight than the state agency psychological consultants' opinions. Generally, more weight is given to treating source opinions than non-treating source opinions. *See Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006) ("The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."). The problem here is that Kitten is not considered a treating source or an "acceptable medical source" as a nurse practitioner. A "treating source" is a "physician, psychologist, or other acceptable medical source" who treats the claimant. 20 C.F.R. § 404.1502. "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the

impairment(s), and physical and mental restrictions." SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006) (citing 20 C.F.R. § 404.1527(a)(2)). "Acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Nurse practitioners cannot provide "medical opinions" and they fall under the category of "other medical sources." 20 C.F.R. § 404.1513(d)(1). Although the ALJ must consider this evidence, it is not entitled to more weight than the state agency consultants' opinions, but should be evaluated according to the factors described under 20 C.F.R. § 404.1527(c).

Keyser acknowledges that Kitten is not an acceptable medical source, but argues she works closely with and under the direction of Monte Bernhagen, M.D., the medical director at Berryhill. She also argues that failing to give credit to Kitten's opinion because she is not an acceptable medical source unfairly penalizes her for living in a community without a psychiatrist. She asserts there are no other medical opinions in the record and Kitten's opinion identifies serious limitations which are consistent with other evidence in the record.

The ALJ did not have the opportunity to consider Kitten's mental RFC assessment, so I cannot say he erred in assigning "greater weight" to the opinions of the state agency psychological consultants, who were the only medical sources to identify functional limitations. Because I find this case should be remanded for other reasons discussed below, I offer no opinion on the weight that should be given to Kitten's assessment. The ALJ shall consider this evidence on remand and discuss the weight he assigns it then. However, the ALJ need not consider the exhibits relating to Keyser's previous hospitalizations unless he finds it necessary in reevaluating her RFC.


**B.      *Episodes of Decompensation***

Keyser argues there are episodes of decompensation that should have been considered for determining whether her impairments met or medically equaled any of

the listing criteria. She points out that she has been voluntarily and involuntarily committed to hospitals in the past and submitted evidence of these hospitalizations to the Appeals Council.

The Commissioner argues Keyser's purported episodes of decompensation were not repeated episodes, each of extended duration as required by the listing criteria. The Commissioner suggests that Keyser has only shown that she was hospitalized for three days in 1997 and the other evidence of her hospitalizations does not meet the requirements for intensive treatment and length of time to qualify as an "episode of decompensation" as defined under the regulations.

Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4). They may be demonstrated by "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* They can be inferred from a significant alteration in medication, hospitalizations, placement in a halfway house, or any other evidence showing severity and duration of the episode. *Id.* The relevant listing criteria for mental impairments require a showing of repeated episodes of decompensation, each of extended duration. *Id.* Repeated episodes of decompensation, each of extended duration means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* If they are outside of this range, the ALJ must "use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

The evidence in the record does not demonstrate any repeated episodes of decompensation, each of extended duration, as required by the relevant listings the ALJ considered. Keyser's hospitalization at Trinity Regional Hospital in January 1997 does

24

not meet the extended duration requirement for an episode of decompensation because it lasted five days. AR 667-83. It also pre-dates Keyser's alleged onset date. Her hospitalization at Mercy Medical Center in January 2001 also lasted five days. AR 689. Keyser's other hospitalizations are mentioned throughout the record, but those hospitalizations seem to either pre-date Keyser's alleged onset date or do not appear to meet the durational or intensive treatment requirements.[4] The ALJ did not err by finding that Keyser had not suffered any repeated episodes of decompensation, each of extended duration. This finding is still supported by substantial evidence when considering the new evidence.

## C.     Claimant's Credibility

Keyser argues the ALJ erred in assessing her credibility by relying on factors that were not inconsistent with the record. She contends some of the ALJ's reasons for discrediting her are actually symptoms of her impairment and should not be used as a basis for rejecting her subjective complaints. The Commissioner argues the ALJ provided good reasons for discounting Keyser's subjective complaints and elaborates on the evidence that supports each of those reasons.

The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ does not need to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff*, 421 F.3d at

---

[4] Exhibit B27F from Keyser's in-patient hospitalization at Mary Greeley Medical Center from January 6 to January 9, 1997, is unreadable.

791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnart*, 393 F.3d 798, 801 (8th Cir. 2005).

While the ALJ offered several good reasons for discrediting Keyser's subjective complaints, I find that the ALJ erred by heavily relying on Keyser's noncompliance with recommended treatment without considering whether her mental impairments were related to her noncompliance. In cases involving mental impairments, courts have recognized a mentally ill person's noncompliance with treatment recommendations can be related to the mental impairment itself, which is something the ALJ must take into account. *See Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) ("Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'"). An ALJ's credibility determination is not entitled to deference when he or she relies primarily on the claimant's noncompliance with recommended treatment without considering whether it is related to the claimant's mental impairments. *Watkins v. Astrue*, 414 Fed. Appx. 894, 896 (8th Cir. 2011).

In *Wildman v. Astrue*, the Eighth Circuit distinguished *Pate-Fires* based on the nature of the claimant's mental impairment, her noncompliance with a prescribed diet rather than noncompliance with psychiatric medication, and the lack of evidence linking her mental limitations to her repeated noncompliance. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). The court found Wildman's noncompliance was not justified by her mental limitations related to depression as it was for Pate-Fires who had severe schizoaffective disorder. *Id.*

This case falls between *Wildman* and *Pate-Fires*. Keyser suffers from major depressive disorder vs. bipolar disorder and personality disorder. She has been

noncompliant with her psychiatric medications as well as doctor's recommendations to exercise and her CPAP therapy. There is some evidence that her noncompliance may be related to her impairments, as she told her provider that she was sometimes too exhausted to take her medication and that she started taking a higher dose on her own because she thought it was better. However, there is also evidence that she understood the consequences of noncompliance, acknowledged that she felt better when she was compliant with her medication and stopped taking medication for legitimate concerns, such as side effects. Ultimately, the determination of whether her noncompliance is related to her mental impairments should be made by a medical professional. *See Pate-Fires*, 564 F.3d at 946-47 (finding that the ALJ's conclusion that noncompliance was attributable solely to free will was tantamount to the ALJ "playing doctor," which is forbidden).

The ALJ did not indicate whether he considered the relationship between Keyser's mental impairments and her noncompliance. However, noncompliance with recommended treatment was used as a basis to discredit the severity of her IBS, sleep apnea, mental impairments, and the effects of her obesity. AR 22-26. The ALJ referred to her "pattern of noncompliance with admittedly helpful medication" and her "habitual noncompliance with treatment recommendations" in evaluating her credibility without considering whether her noncompliance was related to her mental impairments. AR 25-26. Because this was one of the ALJ's primary reasons for discrediting Keyser's allegations, and there is some evidence suggesting her noncompliance could be related to her mental impairments, I find this case should be remanded to the ALJ to obtain evidence on whether her noncompliance with treatment recommendations is related to her mental impairments. The ALJ shall reevaluate Keyser's credibility and RFC in light of this evidence.

## D.    Third Party Function Report

Keyser argues that the third party function report provided by her husband should not have been discredited due to his financial and emotional stake in the outcome because the Social Security Administration requested this report from him.  Keyser suggests that his report corroborates evidence that would lead to a finding of disability and it is not inconsistent with other evidence in the record.  The Commissioner argues the ALJ provided valid reasons supported by substantial evidence for discrediting Mr. Keyser's report.

An ALJ may discount corroborating testimony on the same basis used to discredit the claimant's testimony.  *See Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 2006); *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (ALJ's failure to give specific reasons for disregarding testimony of claimant's husband was inconsequential, as same reasons ALJ gave to discredit claimant could serve as basis for discrediting husband).  An ALJ may also discount corroborating testimony if the person has a financial interest in the outcome of the case.  *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).

The ALJ discounted Mr. Keyser's report for the same reasons he discredited Keyser's own subjective complaints.  While I have found that some of the reasons for discrediting Keyser were error, the ALJ also found that Mr. Keyser's financial and emotional stake in the outcome undermined his credibility.  This is a valid reason.  The ALJ does not need to reconsider Mr. Keyser's report on remand unless he determines it is appropriate to do so in light of his reconsideration of other evidence.

## E.    Hypothetical Question to the VE

Finally, Keyser argues the hypothetical question is not supported by substantial evidence because the additional evidence submitted to the Appeals Council includes a functional capacity evaluation which found Keyser is limited to sedentary work and is not able to safely perform lifting, carrying, pushing, pulling, gripping, pinching,

sitting, standing, walking, dexterity or positional tasks on a continuous, day after day basis. The additional evidence also includes Kitten's mental RFC assessment, which indicates she is incapable of performing semi-skilled work. Keyser argues the VE's testimony identifying light, semi-skilled work is not supported by substantial evidence when considering this new evidence.

Because I am recommending remand for the ALJ to consider whether Keyser's noncompliance with recommended treatment is related to her mental impairments, I find it unnecessary to consider whether the current hypothetical question is supported by substantial evidence. The ALJ's reevaluation of Keyser's credibility could lead to a different RFC and the need to obtain additional VE testimony. In addition, the ALJ will have the opportunity to consider the new evidence that was submitted to the Appeals Council and can reach his own conclusion as to whether that evidence changes Keyser's RFC or undermines this VE's testimony.

### Conclusion and Recommendation

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **reversed** and this case be **remanded** for further proceedings consistent with this report. Judgment should be entered in favor of Keyser and against the Commissioner. On remand, the ALJ shall: (1) obtain evidence from an acceptable medical source on whether Keyser's noncompliance with recommended treatment is related to her mental impairments, (2) reevaluate Keyser's credibility and RFC, taking into account the above evidence and the new evidence that was submitted to the Appeals Council, and (3) obtain additional VE testimony if necessary.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 31st day of May, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE